KANSAS CITY GRANITE & MONUMENT COMPANY, JAMES P. SEXTON, A. A. BIANCHI and MARY BIANCHI, Appellants, v. LILLIAN B. JORDAN ET AL.—295 S. W. 763.

Division Two, April 9, 1927.

1. **TESTIMONY: Credibility.** Contradictory testimony and shifting and evasive conduct to avoid the payment of an honest debt on the part of a party to a suit to determine title lessens the credence which should otherwise be given to her testimony.

2. ———: ———: **Contradictory.** Where the testimony of a witness on the trial of a suit to determine her title to property is in square contradiction of her testimony in a former trial of an attachment suit for the same property on the question of ownership, and the contradiction is not explained, so that it is obviously apparent that her testimony on one or the other occasion was false and without probative force, the appellate court is not concluded by her testimony on the trial of the instant case, but its credence is left to the court, to determine in view of all the correlative facts which statement is true.

3. **HOMESTEAD: Housekeeper.** A homestead is limited to a housekeeper, or head of a family, which are statutory expressions meaning one and the same thing. A widow who has neither children nor others dependent upon her does not have a homestead as against general creditors in property she occupies as a dwelling and claims to own in her own right.

4. ———: **Subject to Mechanic's Lien.** A homestead is subject to the lien of a materialman who, under agreement with the owner furnishes materials for its improvement, and a sale of the property in pursuance to a valid mechanic's or materialman's lien carries the title and extinguishes the homestead.

5. **CONVEYANCE: Spoliated Deed.** Changes in a deed by which the grantor had conveyed the property to her sister, so as to make it appear as a conveyance to said grantor by the purchaser of the property at a sheriff's sale under a judgment in a valid mechanic's lien case against her and said sister, and especially where said grantor had herself, *in a former* suit, testified that she had previously conveyed the property to said sister, render the deed void, as a conveyance to the substituted grantee.

6. ———: **Fraudulent Transaction: Enforcement.** A contract, whether express or implied, if based upon an illegal consideration, whether appearing on its face or proved **aliunde,** cannot be enforced in law or equity, but upon

the disclosure of the illegality the gates of legal and equitable relief are closed against the party who seeks to enforce the fraudulent transaction.

7. ————: **In Trust for Benefit of Grantor: To Defraud Creditors.** A debtor cannot create a trust in what he claims is his own property. All conveyances for the use of the grantor are fraudulent and void as against creditors and others who have just claims upon the property conveyed. A claim by the debtor that the purchaser, at the sale of her property under a valid mechanic's lien judgment against her, bought it with money furnished by her and that he afterwards held the title in trust for her, and later conveyed it to her by a deed which on its face shows that it was both antedated and so altered as to be void, cannot be allowed, where the mutilation of the deed was her act, or she caused it to be recorded with knowledge of its spurious character, and her other creditors, without actual knowledge of its mutilation, before it was recorded bought from said purchaser in good faith for the purpose of securing themselves against loss.

8. ————: **Innocent Purchaser: Later Record: Consideration: Discharge of Debt.** A grantee, for a valid and adequate consideration, without knowledge or notice of any infirmity in the title except what the records show, takes the title as against a prior grantee in a subsequently recorded deed which has been so altered as to be a nullity. And the fact that the consideration was not money paid, but a discharge of a preexisting debt and the extension of further credit to his immediate grantor, does not affect the validity of the transaction, but he is still a purchaser for value within the meaning of the statute (Sec. 2200, R. S. 1919).

9. ————: **By Unrecorded Deed: Notice Imparted by Possession.** Occupancy of the premises is not notice to the purchaser of the record title that the occupant claims to be the owner under an unrecorded deed, nor does it put upon such purchaser the duty to discover by ordinary inquiry the existence of an unrecorded prior deed under which the occupant claims title, nor does it charge the purchaser of the record title of actual knowledge of the occupant's adverse claim. No instrument in writing whereby real estate is affected in law or in equity is valid until it is recorded, except as between the parties thereto and such persons as have actual knowledge of its existence.

10. ————: ————: ————: **Disclaimer of Ownership: Former Testimony.** Occupancy of land by one in possession, after a disclaimer of ownership, ceases to be notice of any equities therein which he might otherwise assert. The testimony of defendant in an attachment suit against the land in which she denied title in herself and asserted title in the apparent record owner, is such a disclaimer of ownership as bars her to assert in a later suit to quiet title that the grantee of such record owner was chargeable with notice by her possession of the property that she was the actual owner under a prior unrecorded deed to her from such record owner.

11. ————: **Continued Possession after Foreclosure of Lien: Notice to Purchaser.** Possession consistent with the theory that the occupant does not claim ownership is a continued possession after the occupant's ownership has been terminated of record by a foreclosure of a lien on the premises. A holding over by the occupant after the foreclosure of a valid mechanic's lien and the vesting of title in the purchaser thereunder does not alone warrant a finding that the grantee of such record purchaser had actual notice of any claim to the property by such occupant, nor that a later grantee had notice that his grantor was chargeable with notice.

12. ————: **To Defeat Creditors: Right of Fraudulent Grantee: Knowledge of His Grantee.** A transfer of property in fraud of creditors, while void as to them, is binding on the parties and those in privity with them. A conveyance to a third party for the purpose of defeating the collection of a

judgment against the person who has furnished the purchase money is a fraudulent transaction; and when such person causes the property to be conveyed to a fraudulent grantee, such grantee will take absolute title as against the fraudulent grantor, which he can retain or convey at will. And it is therefore immaterial that a bona-fide grantee of such fraudulent grantee had actual knowledge that his immediate grantor was the trustee of the party who furnished the purchase money, when he purchased the property in aid of the creditors' efforts to collect their judgment.

**13. NEGOTIABLE INSTRUMENT: Transfer without Notice of Infirmaties.** A transferee for value of a negotiable note, by an unrestricted endorsement by the payee, before maturity, without notice of defenses as between the original parties thereto or of any infirmity in the deed of trust securing its payment, receives it in due course, free from defenses available to the maker as against the payee, and is entitled to enforce payment for the full amount; and a subsequent purchaser for value after maturity succeeds to all the rights of such transferee, and with the note passes to the purchaser all rights of the transferee under the deed of trust.

Corpus Juris-Cyc. References: **Agency,** 2 C. J., Section 544, p. 864, n. 93. **Bills and Notes,** 8 C. J., Section 685, p. 467, n. 31. **Fraudulent Conveyances,** 27 C. J., Section 415, p. 648, n. 29. **Homesteads,** 29 C. J., Section 224, p. 869, n. 90. **Housekeeper,** 30 C. J., p. 475, n. 59. **Quieting Title,** 32 Cyc., p. 1372, n. 26.

Appeal from Jackson Circuit Court.—*Hon. Charles R. Pence,* Judge.

REVERSED AND REMANDED *(with directions).*

*E. M. Bartlett* for appellants Kansas City Granite & Monument Company and James P. Sexton.

(1) The court erred in refusing an order permitting the appellants to have the deed photographed in order to lay the foundation for expert testimony with regard to its genuineness, the change in the instrument appearing to have been effected by a different hand writing and in a different ink from that employed elsewhere in the writing in the deed, the alterations being sufficiently suspicious to call for proof from the party producing the instrument of its genuineness. 3 Ency. Law & Prac. 476, 478; Paramore v. Lindsey, 63 Mo. 63; Smith v. Forry, 69 Mo. 142; Stilwell v. Patton, 108 Mo. 352; Powell v. Banks, 146 Mo. 620; State v. Chick, 146 Mo. 645; Kelley v. Thuey, 143 Mo. 422; Jackson v. Osborn, 2 Wend. (N. Y.) 555; Rogers v. Page, 140 Fed. 596; Crabtree v. Clarks, 20 Me. 337; McMecken v. Beauchamp, 2 La. 290. (2) The court erred in its judgment and decree in holding that Lillian B. Jordan continued in possession of said property which at the death of her former husband, Harry F. Kinsinger, was her homestead. She never claimed it in her answer or otherwise as her homestead—nor as exempt as her homestead. Having no family or children and not being a housekeeper the head of a family, she could not claim the property

as exempt under the statute.  Sec. 5853, R. S. 1919; 15 Am. & Eng. Ency. Law (2 Ed.) 546, 773; January v. Marler, 274 Mo. 546.  (3) A widow with no one in the house but servants is not the head of a family within the meaning of the exemption statute.  Murdock v. Dalby, 13 Mo. App. 41.  (4)  The object of the statute is to protect a family having a head.  Ward v. Tunnah, 25 Ark. 103; Harbison v. Vaughn, 42 Ark. 539; Barnett v. Knight, 7 Colo. 365; Charles v. Lamberson, 1 Iowa, 441, 63 Am. Dec. 457; Cook v. McChristian, 4 Cal. 26; McMurray v. Shuck, 6 Bush. (Ky.) 111; Fore v. Fore, 2 N. D. 267; Franklin v. Coffee, 18 Tex. 415, 70 Am. Dec. 292; 15 Am. & Eng. Ency. Law, p. 535, sec. 7, note 4.  (5) The family is a necessary prerequisite for exemption of a homestead.  15 Am. & Eng. Ency. Law, p. 535, note 5; Murdock v. Dalby, 13 Mo. App. 41; State v. Kane, 42 Mo. App. 253; Graham v. Lu, 69 Mo. 334; Ridenour Baker Grocery Co. v. Monroe, 142 Mo. 165; Bushwell v. Loomis, 234 Mo. 137.  (6)  Even if the real owner of said property she is estopped by her acts and declarations under oath from claiming to be the owner, and she waived her right to said property and ratified the title which was of record in Oloff.  11 Am. & Eng. Ency. (2 Ed.) p. 446.  (7)  As a matter of law Oloff could not hold the property in secret trust as against appellees creditor.  In order to create an express or implied trust there must be a lawful definite object to which the subject-matter of the trust is to be devoted.  The object of the trust must be legal, for no valid trust can be founded on an interest derived from an illegal contract or established in contravention of the general policy of the law.  Lewis on Trusts (8 Ed.) 84, 94; Hill on Trusts (4 Am. Ed.) 45; 28 Am. & Eng. Ency. Law, p. 866, sec. D.  (8)  A debtor cannot convey his property in trust for himself and by such transfer defeat the rights or remedies of his creditors.  All conveyances for the use of the grantor are fraudulent and void against creditors and others having just claims upon the grantor or upon the property conveyed.  14 Am. & Eng. Ency. Law, p. 247-aa; 2 Perry on Trusts (3 Ed.) sec. 165; Roberts v. Barnes, 127 Mo. 405, 48 Am. St. 640; Nat. Bank v. Powers, 134 Mo. 432; State v. McBride, 105 Mo. 265.  (9)  The deed in any view is void as against the purchaser (Sexton) for value from Oloff, Sexton being without actual notice of an unrecorded deed from Oloff, even if such deed actually existed.  Trigg v. Vermillion, 113 Mo. 231; Ladd v. Anderson, 133 Mo. 265; Vance v. Corrigan, 78 Mo. 94; R. S. 1919, sec. 2200.  (10)  A bare inspection of the deed shows it to be a forged and altered instrument, and Handy's attempted explanation does not explain.  If the extrinsic evidence derived from an inspection of the writing shows the alteration to be of a spurious character, warranting the inference that it was not honestly and properly made, the party offering the instrument so altered must

316 Mo.—71.

.explain it. 3 Enc. Law & Prac. 476; Paramore v. Lindsey, 63 Mo. 63; Smith v. Ferry, 69 Mo. 142; Stilwell v. Patton, 108 Mo. 352; Powell v. Banks, 148 Mo. 620; State v. Chick, 146 Mo. 645; Burton v. Ins. Co., 96 Mo. 204; German Am. Bank v. Manning, 133 Mo. App. 294. (11) When a title has vested in an innocent purchaser without notice of outstanding equities he can convey a good title to one having notice of such equities and where no fraud is shown it is not necessary that the holder of such deed should have paid the reasonable value of such real estate. Campbell v. Gas Co., 84 Mo. 352.

*Gamble, Pugh & Browne* for appellants A. A. and Mary Bianchi.

(1) Whether Sexton or his attorney believed Oloff took title in trust for Kinsinger is not material, because previously she had sworn otherwise, and is now estopped from claiming that they should have known her testimony was untrue. (a) Kinsinger's unexplained contradiction of her former testimony defeats her later testimony as a matter of law. Steele v. Ry. 265 Mo. 97; Monroe v. Ry., 249 S. W. 644. (b) Even if Sexton's title were bad, which it is not, still it is the validity of the title of Bianchi, not of Sexton, that is involved; and Bianchi's title is good unless he had actual notice that Sexton's title was bad, if it was. R. S. 1919, Secs. 2198, 2199, 2200; 2 Devlin on Deeds (3 Ed.) p. 1378, sec. 746. (2) Notice to a grantee like Bianchi, or to any other grantee, of an unrecorded deed, is not "actual" under our recording act, unless he has personal knowledge of such deed, or actually knows that by ordinary inquiry he would learn it. Beatie v. Butler, 21 Mo. 313; Vaughn v. Tracy, 22 Mo. 415; Vaughn v. Tracy, 25 Mo. 318; Speck v. Riggin, 40 Mo. 405; Maupin v. Emmons, 47 Mo. 304; Rhodes v. Outcalt, 48 Mo. 367; Whitman v. Taylor, 60 Mo. 127; Drey v. Doyle, 99 Mo. 459. (3) For a grantee to take title with actual notice that it is bad is fraud, and therefore the burden of proving it is upon the party asserting that the grantee had actual notice. Ladd v. Anderson, 133 Mo. 625; Strong v. Whybark, 204 Mo. 241; Henderson v. Calloway, 211 Mo. 536; Anderson v. Cole, 234 Mo. 1; Harrison v. Moore, 199 S. W. 188. (4) Bianchi paid full value, and the $900 consideration named in the Oloff-Sexton deed was no notice of any infirmity therein, as deeds purporting to be for a "valuable" consideration, however small, as distinguished from those purporting to be for merely a "good" consideration, do not charge the purchaser of a title dependent upon them with notice of any infirmity therein. State Bank v. Frame, 112 Mo. 502; Stuart's Appeal, 98 Pa. St. 377; Strong v. Whybark, 204 Mo. 341, 12 L. R. A. (N. S.) 240; Monroe v. Ry., 249 S. W. 644. (5) Kinsinger's possession was not notice to Bianchi of her claim of title, because: (a) Under our Recording

Act possession alone neither puts a purchaser of the record title upon inquiry, nor is it sufficient to uphold a finding of "actual notice." Beatie v. Butler, 21 Mo. 313; Vaughn v. Tracy, 22 Mo. 415; Vaughn v. Tracy, 25 Mo. 318; Maupin v. Emmons, 47 Mo. 304; Drey v. Doyle, 99 Mo. 459; McMurray v. McMurray, 258 Mo. 405. (b) Possession such as Kinsinger's, which was only a "retained" possession, after her deed to Scott and after foreclosure of the superior lien of the Dierks Lumber Company, is not only no "actual notice" to a purchaser of the record title, but is not even sufficient as evidence to support a finding that such purchaser had such notice. Bloomer v. Henderson, 8 Mich. 395; Van Keuren v. Central, 38 N. J. L. 165; Hockman v. Thuma, 60 Kan. 519. (c) Possession by Kinsinger is neutralized by her disclaimer of title in her testimony at the abatement trial. Vaughn v. Tracy, 22 Mo. 414; Garrett v. Wiltse, 252 Mo. 699. (d) The facts and circumstances attending Kinsinger's possession are not sufficient as circumstantial evidence to supplement the kind of possession that she had to an extent sufficient to uphold any finding of actual notice that she claimed ownership as against Oloff. Beatie v. Butler, 21 Mo. 313; McMurray v. McMurray, 256 Mo. 405. (6) Bianchi had no notice of what Ringolsky thought or did, because Ringolsky did not represent Bianchi. They were and yet are total strangers, and Ringolsky did not appear in the chain of title. (7) If Kinsinger paid the consideration for the Pickett-Oloff deed, then it was at her own instance that Pickett inserted Oloff's name as grantee therein, and it necessarily was with the fraudulent intent by Kinsinger to defeat collection of plaintiff's judgment debt, which makes Oloff's deed to Sexton valid and estops her from questioning it. Rowley v. Rowley, 197 S. W. 152; Butte Inv. Co. v. Bell, 201 S. W. 880.

*J. M. Johnson, D. W. Johnson* and *S. M. Johnson* for respondent.

(1) The property in controversy being exempt, that is to say, a homestead of a value not exceeding three thousand dollars, the Monument Company, as a judgment creditor, was not entitled to complain of any conveyance made by the homesteader, even if such conveyance were made with the intent of hindering and defrauding the creditor. Having no right to sell said property under execution, the creditor had no right to complain of any conveyance made by the debtor. Pocoke v. Peterson, 256 Mo. 501. (2) The plaintiff and its associate defendants succeeded merely to the rights of the Monument Company and are bound by the admissions of that Company. (3) The Monument Company having alleged that the conveyances from Mrs. Jordan to Cora Scott and the subsequent deed from Pickett to Oloff were made for the purpose of defrauding the

Monument Company admitted that Mrs. Jordan was the owner of the property and were bound by that admission at the time the deed from Oloff to Sexton was procured. A defrauding creditor by attaching property as that of the defendant concedes it to be his. Stokes v. Burns, 132 Mo. 214. (4) The proof shows beyond question that Oloff executed and acknowledged the deed to Mrs. Jordan November 17, 1914. The effort made to discredit this deed never emerged from the field of mere hectic suspicion. Handy testified that the deed was genuine and the notary who took Oloff's acknowledgment testified that he took Oloff's acknowledgment on that date to a quit-claim deed to Mrs. Jordan. All the admitted facts and circumstances in evidence show that the parties knew of the existence of this deed and that it had not been recorded at the time the deed from Oloff to Sexton was taken. Ringolsky virtually admits such knowledge and the facts that they took the affidavit from Oloff that he had made no other deed, and went to the court house to ascertain if a deed had been placed on record before paying over the money are sufficient to convince the trier of fact that they had actual knowledge of this outstanding deed. (5) But it is not necessary to establish the existence of actual knowledge by direct and positive proof. Actual knowledge may be inferred not only from facts and circumstances, but from facts and circumstances which would be merely sufficient to put a prudent man upon inquiry. (6) Plaintiff and its associate defendants must recover if at all upon the strength of their own title and must recover upon the Oloff deed to Sexton. It is immaterial whether Mrs. Jordan had taken a deed back from Oloff to herself. If Sexton, or those whom he represented, had knowledge of facts and circumstances tending to show that Mrs. Jordan was the actual owner of the property, and that Oloff was merely holding the title for her, no recovery can be had under the Sexton deed. Drey v. Doyle, 99 Mo. 459; State Bank v. Frame, 112 Mo. 512; Brown v. Baldwin, 121 Mo. 115; Shaffer v. Detie, 191 Mo. 393.

WALKER, J.—This is a suit in equity to quiet the title to a lot in Kansas City under Section 1970, Revised Statutes 1919. The finding of the trial judge was that the parties did not come into court with clean hands and being *in pari delicto* neither was entitled to recover. The effect of this ruling was to confirm the title of the lot in the respondent Jordan. The court did find affirmatively that the defendants were entitled to recover their costs of the plaintiffs in this behalf expended. From this judgment the plaintiffs have appealed.

The property in controversy was originally owned in fee by the respondent, who was a widow named Kinsinger, afterwards intermarried with one J. W. Jordan. During her widowhood she con-

tracted with the appellant, the Monument Company named, for a monument to be erected over the grave of her husband, Kinsinger, at an agreed price of $2,650. Of this amount she paid $1,000 at the time the contract was entered into, leaving a balance due and unpaid of $1650. As an evidence of this indebtedness she gave the Monument Company a due bill, June 2, 1913, pledging the payment of the unpaid balance within one year with interest at six per cent per annum. Three days later the Monument Company assigned the due bill to James F. Aylward, as collateral to secure a debt it owed a creditor named White. Mrs. Jordan made no payments on the due bill. Aylward's attorney in his efforts to collect the same discovered no record evidence of Mrs. Jordan having any property, but on the contrary that on the 25th day of April, 1913, she had borrowed $3,500 and to secure the payment of a note for that sum had given a deed of trust on the property in controversy. The note involved in this transaction was endorsed to T. C. Wiggins, who owned it at the time of the trial. The validity of this transaction is not questioned. Three days later, April 28, 1913, she deeded the property to her sister, Cora Scott, for a consideration of $9,000 named in the deed.

A transcript of her testimony in an attachment suit (of which more later), to collect the balance due by her to the Monument Company, was introduced in evidence, in which she testified that her sister did not pay her $9,000 for the property, but that the real consideration was $6,500, of which $3,000 was paid by a check on the Troost Avenue Bank, on which the respondent received the money, and the remainder, $3,500, was settled by the grantee assuming, in what manner she did not state, the payment of the note for that amount secured by the deed of trust on the property. This deed by the respondent to her sister was not filed for record until October 2, 1913, or six months after the execution of the same. After the deed had been made to the sister by the respondent the latter continued in the possession of the property from April 30 to August 1, 1913, made various changes in the building located on the lot in controversy, by converting it from a dwelling into two apartments or flats, for which she failed to pay a balance due a lumber company for materials used in making the changes. To secure the payment of this balance the lumber company filed and foreclosed a mechanic's lien on the property, and on November 11, 1914, pursuant to a judgment rendered on this lien, which was against the respondent and her sister Cora Scott, the sheriff sold and conveyed the property to James F. Fickett, attorney for the lumber company. On November 17, 1914, Pickett, for a consideration of $669.45, the amount of the lien, interest and costs of foreclosure, sold and conveyed the property subject to the $3,500 deed of trust, to William Oloff. It is the contention of the respondent that she furnished the money with

which Oloff paid Pickett, and that Oloff had no interest in the property and took the title for her, and that he in turn, November 17, 1914, in the name of "William H. Oloff," quitclaimed the property to her. This deed, the validity of which is one of the features of this controversy, she did not have recorded until October 9, 1915.

The appellants contend that the deed purporting to have been made by Oloff to the respondent was a false and spoliated conveyance. That its character was not known to appellants until it was submitted in evidence; and that it was in fact the original deed from Cora Scott to respondent made succeeding the respondent's conveyance of the property to Cora Scott to avoid the claims of creditors, and was so spoliated as to purport to be a deed from "William H. Oloff" to the respondent.

On June 11, 1914, the Monument Company brought suit by attachment against the respondent to recover. the balance due on the monument bought by her, as evidenced by the due bill. It was in the trial of this suit that the respondent, in addition to testifying that she had sold and conveyed the property (in April, 1913) to her sister, Cora Scott, further stated that later she had sold the property to William Oloff; and at that time (January 26, 1915) he owned the property in controversy, lived in a part of it and that she rented the remainder from him and paid him a rental of $50 per month. That he used to rent from her, but that she now rents from him. In addition she produced a number of receipts given by Oloff to her, evidencing her payments of rent to him at the rate of $50 per month. The result of this suit was a verdict sustaining the attachment on two of the grounds which related solely to her conduct previous to June 11, 1914 (the date of the affidavit), the first being that she had fraudulently conveyed or assigned her property and effects; and the second, that she had fraudulently concealed, removed or disposed of her property or effects. On the third ground, that she was about to fraudulently convey her property, the attachment was not sustained, and there was no finding that Oloff was holding the title obtained from Pickett as her trustee. The court's judgment, entered March 22, 1915, was that the jury having returned a verdict for the attachment the same was sustained and judgment for Aylward against the respondent was rendered for the full amount of the due bill with accumulated interest thereon in the sum of $1,828.75, and costs; none of which has been paid. Aylward made formal assignment of this judgment to James P. Sexton for the Monument Company, December 2, 1917.

In September, 1915, an attorney representing Oloff, who had acquired title to the lot under the deed from Pickett, offered to sell Oloff's equity of redemption in the same for $900, subject to the lien of the deed of trust to secure the payment of the note for $3,500

before referred to. The Monument Company, to which the offer was made, through its attorney, proposed to accept the offer on the following conditions:

"(a)   That Oloff should make an affidavit corroborating the testimony previously given by Mrs. Kinsinger at the trial of the plea in abatement, i. e., that he was the absolute and sole owner of the property.

"(b)   That the deed to be executed by Oloff should be one of general warranty.

"(c)   That the records be checked to date and show clear title in Oloff, subject alone to the deed of trust."

On September 17, 1915, upon an abstract of the lot having been produced showing a clear title in Oloff, the Monument Company agreed to the offer of sale and being unable to readily raise the amount required to make the purchase, the officers of the Monument Company borrowed the necessary amount from its attorney name Ringolsky and executed to a Miss Collier, who represented Ringolsky, a note for $1,-150, $900 of which constituted the purchase price of the lot and $250 of which was a fee due to the Company's counsel, who was in fact furnishing the cash required to pay Oloff, but being absent was as stated represented by Miss Collier, one of his employees. The sum thus borrowed was evidenced by a note signed by Sexton and the other officers of the Monument Company and made payable to Miss Collier and was secured by a second deed of trust on the property. The amount due Oloff was thereupon paid to him and he delivered a warranty deed of the property to Sexton, together with his affidavit of ownership. These instruments, together with the deed of trust from Sexton to Miss Collier, were thereupon filed for record. On October 2, 1915, Alyward, to remove the cloud from the title to the property created by the judgment in the attachment suit, executed a quitclaim deed to Sexton. On November 28, 1919, Sexton executed a declaration to the effect that he had received the title from Oloff in trust for the Monument Company. After the deed from Oloff to Sexton and the deed of trust from the latter to Miss Collier had been filed for record, the respondent, on the 9th day of October, 1915, filed for record the alleged warranty deed from Oloff to herself. She testified, in effect, that although she had received it on the day it was dated, she had kept it under lock and key during the eleven months that elapsed from the day she received it until she filed it.

The Monument Company was indebted to Bianchi & Son, granite dealers of Barre, Vermont. To satisfy this indebtedness and extend its credit to the extent of $3,400 with that company, it sold and conveyed to A. A. Bianchi, with Sexton as grantor, the property in controversy, subject to the two deeds of trust referred to.

In February, 1918, Mary Bianchi, the mother of A. A. Bianchi,

bought the $1,150 note made by Sexton to Miss Collier and secured by the second deed of trust on the property in controversy. This left the issue here to be determined between the Bianchis and the respondent as the real parties in interest. This case was heard by the court in February, 1923, and the hearing of the testimony was taken under advisement and a decree therein was not rendered until in April, 1924, when, after the required procedure, it was appealed to this court.

If any other material facts are found necessary to a determination of the matter at issue they will be stated in the opinion.

I. It is trite and perhaps elementary that an appellate court, in the administration of justice, seeks diligently to ascertain from all of the facts the character of the transaction. In a case as at bar, **False Testimony.** the court is not only authorized but it is its duty to sift all of the facts to enable it to determine on which side right and justice may be found and when found to rule accordingly. We have read the entire evidence, oral and documentary, and upon our summarized statement of the same, guided by the applicable law, we have based our conclusions in regard thereto.

*Imprimis:* The conduct of the respondent from the time of her refusal to pay the balance due on the monument down to the trial and the determination of this case in the circuit court, has not been characterized by honesty of purpose. Contradictory testimony and shifting and evasive conduct to avoid the payment of an honest debt cannot but lessen the credence which should otherwise be given to testimony. When sued in attachment and the respondent's plea in abatement was being tried she testified unequivocably that she had no interest in the property in controversy, and that Oloff, when he purchased it from Pickett, did not thereafter hold it in trust for her, but that he owned it outright. When the case at bar was on trial she testified that Oloff took the title to the property in trust for her and that on the same day he re-conveyed it to her. A searching cross-examination elicited no explanation from her of this contradiction, further than a denial of the correctness of the transcript of her former testimony, the verity of which was attested, not only by her counsel Handy, who represented her in the attempt to defeat the attachment, but by the court reporter who took and transcribed her testimony. The reports are replete with denunciations of the conduct of litigants similar to that of the respondent. Our own court has more than once spoken in no uncertain terms on the subject. [Monroe v. Ry. Co., 297 Mo. 633, 249 S. W. 644; Steele v. Ry. Co., 265 Mo. 97, 175 S. W. 177.] In the Monroe case we said, in effect, that where the unexplained statements of a witness are bald contradic-

tions on a vital point, the testimony on one occasion or the other was obviously false and without probative value.

In the Steele case we said in substance that: Neither an attorney nor his client, the litigant, ought to be allowed to play fast-and-loose with courts. . . . Courts are established for the discovery and determination of the ultimate facts; and they ought not to be used as hotbeds for the germination and promotion of perjury. No litigant in his own sole case ought to be heard by a court, without some explanation or excuse, to deny today what he solemnly swore was true on yesterday. . . . When such explanation of mistake or oversight or ignorance or misunderstanding or inadvertence or illness affecting memory, comes in, clearly the rule is that the party-witness is not concluded. . . . But when no explanation or excuse is given, as in the instant case, the matter of the probative effect of such bald contradictions ought to be left to the court to be passed on as a matter of law.

The respondent's statements therefore on one or the other occasion were obviously false and have no probative force. As to which statement was true or which was false the court must determine in view of all the correlative facts.

II. The respondent contends for the first time in her brief, as we read the record, that the property cannot be subjected to the payment of her debt because it is exempt as a homestead.

**Homestead.**

Under the statute, Section 5853, Revised Statutes 1919, the right of exemption to a homestead is limited to a housekeeper or head of a family. There is no pretense that she is entitled to exemption under the latter classification. When she occupied the property as a dwelling she lived alone, having neither children nor others dependent upon her for support. If she asks to claim the exemption as a housekeeper it is enough to say, when we consider the nature and purpose of the homestead law, that a housekeeper is entitled to no other classification than that of the head of a family. In short, the words are synonymous, and are but one of the many tautological instances not infrequent in statutes. In her relations to and the manner in which she held the property she was, therefore, neither a housekeeper nor the head of a family (Elliott v. Thomas, 161 Mo. App. 441, 143 S. W. 563; Seaton v. Marshall, 69 Ky. 429; 30 C. J., 475, sec. 2, cases note 59), and hence was not entitled, if no other reason existed, to claim the exemption. In Elliott v. Thomas, supra, the Springfield Court of Appeals, in a well reasoned opinion by Judge Cox, thus construes the statute, and in the only case in the Supreme Court, January v. Marler, 274 Mo. l. c. 548, in which the

Elliott case has been referred to, the conclusion there reached was not questioned.

Other reasons demonstrate the futility of the respondent's claim that the property is exempt as a homestead. She entered into a contract for the improvement of the property and incurred a debt for the material furnished for and the work performed in the making of said improvements. Neither in the Homestead Statute, Chap. 44, R. S. 1919, nor in that regard to Mechanic's and Materialmen's Liens, Chap. 64, Art. 3, R. S. 1919, is there any limitation upon the latter to enforce a lien for materials furnished or labor performed in the improvement of a homestead. The essential requisites to the creation of a lien under the latter statute (Sec. 7216, R. S. 1919) are a contract between the owner or other person named in the statute, and the mechanic or materialman, the furnishing of the material and the performance of the work by the latter. This having been done a lien paramount to the claim of a homestead exemption is created. A conclusion to the contrary, in a case where the homestead constituted the sole source of recovery, would result in the release of the owner of property from an otherwise valid contract and preclude the other party from recovering compensation for materials furnished and labor performed. The beneficient purpose of the Homestead Law would thereby be perverted and that of the Mechanic's Lien Law defeated. It has been held in another jurisdiction that the purpose of the exception in holding a homestead liable for debts for improvements and not for debts generally, is that those who have furnished the materials and performed the labor should have their remedy out of the property, the value of which, by their labor and materials, they have enhanced. [Lewton v. Hower, 18 Fla. 872.] Other courts of last resort thus tersely state the reason for the exception, in that it is not contemplated by the law that a homestead may be improved and the property itself remain free from liability for debts incurred in its improvement. [Atlas Supply Co. v. Blake, 51 Okla. 778; Vide also 13 R. C. L. p. 608, sec. 69, note 7; 29 C. J. p. 869, sec. 224, note 90.] There was no foundation therefore for the respondent's claim to a homestead exemption of the property and the trial court erred in holding to the contrary.

III. The integrity of the claims against the respondent upon which judgments were rendered and that of the sale of the property to satisfy the same, are beyond controversy. The respondent contends, however, that the grantees of those who purchased the property under the judgments of foreclosure of the mechanic's lien thereon and that of the attachment proceeding acquired no title to the same. More particularly, that the deed from Oloff to Sexton was executed in bad faith with knowledge

**Spurious Deed.**

on the part of Sexton; that Oloff had no title, but had divested himself of the same by his deed to the respondent in November, 1914. It is further contended that the appellants had full knowledge of this conveyance and participated in the fraud of Sexton and Oloff. These are bold words, deserving approval if true, and meriting condemnation if false.

In assuming this attitude the respondent bases her claim to a recovery on the deed which purports to have been made by her to Oloff. Having no paramount claim under the homestead law, interposing no defense to the suit to enforce the mechanic's lien, the judgment in which foreclosed whatever interest she and Cora Scott had in the property, and having failed in her efforts to defeat the proceeding in attachment, she must of necessity, to maintain her contention, rely upon the Oloff deed. That instrument, therefore, demands consideration. A stipulation of the parties making the original of that deed a part of the record enables a critical examination of the same to be made.

A printed form was used in preparing the deed. Erasures in the written portion of the same and the inserting therein of words in different ink and handwriting from that originally used are evident. These instances appear in the date line, the name of the grantor, the place of his residence and the pronouns used in the habendum clause. In the date line the date seems from the erasures to have originally been written out in full. The date, as it now appears, is abbreviated thus: "17——Nov." The name of the grantor, "Wm. H. Oloff" is written over an erasure and there may be faintly traced immediately following Oloff's name but perceptible to the eye, the word, "Scott." The pronouns used in the habendum clause bear evidence of having been changed. In some instances the word "he" seems to have been rewritten and the letter "s" erased from the beginning of the same. The name of "William H. Oloff" in the habendum clause is written following an erasure. The county of the grantor's residence also indicates that it has been changed in being written over an erasure in different ink and handwriting from the description of the property. The word "Scott," which but partly escaped the effort of the spoliator, following that of William H. Oloff as grantor, may not unfairly be held to be the name of the original grantor. The respondent's testimony in the attachment suit that she had sold and conveyed the property to her sister, Cora Scott, and the absence of a record of a reconveyance by the latter to the respondent, give probative force to the foregoing conclusion. The change in the name of the grantor's county, in that Cora Scott lived in Green and Oloff in Jackson County, and the splotch of ink below the name of William H. Oloff at the close of the deed which covers an abrasion of the paper so violently made as

to break the texture of the latter, and which may have assisted in obliterating the name of the original grantor, and the evident changes in the written portions of the acknowledgement, form a chain of circumstances tending to prove the spurious character of this deed and that in its spoliation an unrecorded deed of reconveyance from Cora Scott to the respondent was employed as the vehicle in the perpetration of the fraud. Corroborative of this conclusion in estimating the verity of the oral testimony, in connection with the other facts in the case, is the indefinite evidence of Handy, respondent's attorney at the time of the purported execution of the deed.

In addition, not unworthy of consideration, is the testimony of the notary whose acknowledgment purports to attest the conveyance of William H. Oloff to the respondent by the mutilated deed. On examination the notary was asked "whether or not this isn't a deed that was signed originally by Cora Scott to Lillian Kinsinger and that it was in that condition at the time you placed your certificate of acknowledgment upon it?" To which he answered: "From what I can see here the name 'Scott' appears in different places; I can see the double 'tt' here where this erasure has been made. That's not the only thing, and then the other erasures where it is crossed there, and in this one I can see a 'Scott,' its very dim and faint." In addition the notary stated that he had taken acknowledgments for these parties and that when he took the acknowledgment appearing on his deed it had no erasures, stains or marks of cancellation on it; that he never took an acknowledgment of any one to a deed bearing such marks and changes; that he believes he took an acknowledgment of a deed from Cora Scott.

The appellants contend that the deed from William H. Oloff to the respondent is spurious and urge in addition to the foregoing the following reasons in support of their contention:

When the deed from Oloff to Sexton, based upon a valid consideration and conveying all of the interest of the former to Sexton for the Monument Company, was filed for record, Oloff had left Kansas City. The respondent, whose interest in the property had been foreclosed by the judgments, sale and conveyance of same, as before stated, was without title thereto. Moved by her persistent purpose to avoid the subjection of the property to the payment of her debts she resorted to the scheme of mutilating an unrecorded deed she had from her sister, Cora Scott, to the property, by erasing the name of the latter therefrom and inserting the name of William H. Oloff as grantor and so changing it in other respects and antedating it as to make it appear as a deed made by Oloff to her on the same day he had purchased the property from Pickett who had bought it at the sale under the judgment foreclosing of the mechanic's lien. This course obviated the difficulty of securing a notary who would consent

to take the acknowledgment of a mythical grantor or one falsely personating another. It was evidently more to the purpose to change the Cora Scott deed from the date line to the acknowledgment in such a manner as to cause it to purport to be a deed from William H. Oloff to the respondent, which was done. However, a seemingly trivial error will oftentimes disclose the tortuous nature of a business transaction. Oloff's Christian name was not "William H." as it appears in the mutilated deed, but simply William. It thus appears in Pickett's deed to him, in his deed to Sexton, and in his affidavit of ownership. While a scrivener might have erred in the use of Oloff's name, he himself would not have done so, and have signed his name to the deed to respondent as "William H." instead of William Oloff. No reasoning, not wholly specious, can sustain the integrity of this deed as a conveyance in good faith of the property to the respondent.

IV. A further contention of the respondent is that Oloff bought the property from Pickett with money furnished by her and that he held the title to the same in trust for her. In view of her testimony and conduct and that of her attorney at the time, little credence can be given to their testimony concerning the creation of this trust. Oloff's deed from Pickett for valid consideration was based upon a title acquired by Pickett in the foreclosure and sale under the mechanic's lien judgment, and was paramount to liens or claims other than those of record or of which he had actual notice. When Oloff sold and conveyed the property to Sexton for the Monument Company for a valid consideration, the record showed that the title to the same was clear and free of all liens, claims and encumbrances, except the deed of trust to secure the payment of the note for $3,500. This was nothing more than a legitimate effort on the part of the Monument Company, acting through its authorized agent, to further protect its title to the property acquired under the sale to enforce the judgment in the attachment proceeding. Sexton assured of the clearness of Oloff's title and having no actual or constructive knowledge of any adverse claim of the respondent or any one else, was well within his rights in the purchase of the property. It is a rather significant fact, if the respondent was relying upon the claim now made, that Oloff held the property in trust for her, instead of asserting her ownership to it and proceeding to establish her claim, that she should rely upon the mutilated deed as creating a prior claim of title in her and file it for record upon receiving notice of the transfer of the property by Oloff to Sexton. The attitude of the parties was simply this: Sexton, representing the Monument Company, was endeavoring to protect the property from adverse claims that might be

**Trust Estate.**

made subject to a lien to satisfy the debt she owed the company. She was endeavoring by covert means, dignified by the title of a trust, to defeat that purpose. We have demonstrated the fraudulent character of the mutilated deed; and we are not favorably impressed with the sincerity of the claim now made as to the trust relation existing between her and Oloff. Such a relation, to entitle it to serious consideration, should have been founded in good faith and made to subserve an honest purpose. The sole purpose for which this relation was created, if it existed, was to prejudice the rights of creditors. It is a well defined rule of law which has received emphatic approval in our statutes (Secs. 2275, 2276, R. S. 1919), that a debtor cannot convey his property in trust for himself and by such transfer defeat the rights and remedies of his creditors. All conveyances for the use of the grantor are fraudulent and void as against creditors and others who have just claims upon the property conveyed. A contract, express or implied, based, as in the case at bar, upon an illegal consideration, whether appearing on the face of the contract or proved *aliunde*, cannot be enforced either in law or in equity. The moment the illegality of a transaction is disclosed, the gates of legal and equitable relief are closed against the party who seeks to enforce such a transaction. [Sprague v. Rooney, 104 Mo. 1. c. 358; Sumner v. Summer, 54 Mo. 340; 14 Am. & Eng. Encyc. Law (2 Ed.) p. 247.] Cases illustrative of the application of the above rule are discussed at length in Sprague v. Rooney, supra, and the opinion need not be burdened with quotations from them. It is enough to say that a debtor cannot create a trust in what he claims to be his own property, [Jamison v. Trust Co., 207 S. W. (Mo.) 778.] There is no evidence that Sexton, or in fact any of the appellants, had any knowledge of any of the acts of the respondent or her attorney at that time of the attempted creation or consummation of the trust. While one may purchase property of his debtor to secure the payment of his claim, although he may know that the debtor's object was to defraud other creditors, his purchase will not be deemed invalid unless he in some way participated in the fraudulent purpose. This rule, however, has no application here because of the absence of any knowledge on the part of the appellants of the respondent's fraudulent purpose. We therefore decline to give credence to the testimony of the respondent and her attorney as to the creation of this trust; and if created, that it was founded in fraud and hence ineffectual to impugn the validity of the deed from Oloff to Sexton.

If inadequacy of consideration in the deed from Oloff to Sexton had been pleaded, as it was not, the facts furnish ample refutation of this plea. The consideration named in the deed was $900. The property was not only subject to a lien to secure the payment of the $3,500 deed of trust, but to the hazard of the Aylward litigation in

the attachment suit, which had not then been determined. The question then with Oloff was not the market value of the land, but the value of the title to others than the plaintiff. There was no proof as to what that value was, and the burden of showing inadequacy of consideration was upon the respondent, which burden she did not attempt to remove. If, therefore, the materiality of this question was in issue it must be resolved against the respondent.

V. We have held that Sexton took title to the land with no notice of a prior claim thereto. In so doing the validity of his title is upheld. It is unnecessary therefore to discuss the contention of the appellants that although Sexton's title may be bad A. A. Bianchi's

**Notice.** title is good. Bianchi's title, it will be recalled, was derived from a sale and conveyance for a valid consideration of the property to him by Sexton, representing the Monument Company. There is no claim or even a pretense in the record that Bianchi had any knowledge or notice of any character of the respondent's claims. The transaction between him and the Monument Company bears every evidence of good faith. The latter owed him money on account for granite furnished; it desired to satisfy its debt and extend its credit. To do so it sold and conveyed the property to him for $3,400. The fact that the deed from Sexton to Bianchi was not for a monetary consideration, but in the absolute discharge of a pre-existing debt of the Monument Company and to extend its credit, will not affect the validity of the transaction. Bianchi's relation to the same will still constitute him, within the meaning of the stat-

**Consideration.** ute (Sec. 2200, R. S. 1919), a purchaser for value so as to protect him against a previous unrecorded deed, if any such existed, of the same grantor. [Bank v. Frame, 112 Mo. 502; Trigg v. Vermillion, 113 Mo. 231, 20 S. W. 1047; Ladd v. Anderson, 133 Mo. 625, 34 S. W. 873.] The validity of Bianchi's title is not assailed on the ground of inadequacy of consideration. There could be no basis for this contention, when we take into consideration in addition to the satisfaction of the Monument Company's debt and its extended credit in the sum of $3,400, the note secured by the deed of trust for $3,500 and the second deed of trust of Mary Bianchi for $1,150 with which the property was burdened.

The mutilated deed having been declared to be a nullity, and the record pointing strongly to the fact that its spoliation was the act of the respondent, or that knowledge of its spurious nature must have been possessed by her, its recording imparted no notice to any one.

If it be contended that the occupancy of the premises puts a purchaser of the record title, upon inquiry, under our recording acts (Secs. 2198-2200, R. S. 1919), this is not sufficient nor will it sustain a

claim of actual notice, by which we mean that the purchaser has knowledge of an adverse claim or by ordinary inquiry could have obtained such knowledge. The allegation of the respondent in her answer as to notice of a prior deed has reference to Sexton alone and the notice is stated to consist in the existence of the mutilated deed from Oloff to her of which no one, as we have shown, could have had any knowledge until it was recorded which was subsequent to that from Oloff to Sexton. Having pleaded and proved no notice to Bianchi, respondent's contention now in regard to the same is not entitled to consideration. After the respondent's deed to Cora Scott and the foreclosure and sale of the property under the mechanic's lien, her occupancy of the property may be fitly classified as but a retained possession and as such insufficient upon which to found a claim of actual notice to the purchaser of the record title or to furnish evidence to support a finding that the purchaser had such notice.

**Possession as Notice.**

In Beatie v. Butler, 21 Mo. 313, a decree was sustained against the plaintiffs who were the widow and the minor heirs of Beatie, mortgagor of the real estate in controversy, in a suit against the defendant, who claimed title by mesne conveyances under Fowler, purchaser at a foreclosure. The court overruled the contention of plaintiffs that because they were in possession when the sale was made, Fowler was bound to take notice of the fact that the foreclosure was premature, under the terms of an unrecorded extension agreement between Beatie and the mortgagee, executed concurrently with the deed of trust, and not referred to in the deed of trust, and of which Fowler had no knowledge.

In the Beatie case, as in many subsequent ones, it was held that mere possession of itself is no notice, either actual or constructive, under our statute of conveyances. It is required by the statute that every instrument in writing that conveys any real estate, or whereby any real estate may be affected in law or in equity, be recorded; and no such instrument can be valid, except between the parties thereto and such as have actual notice thereof, until it is recorded. In this enactment we may see a great advance to the measure of having all instruments in writing, affecting real estate, spread upon record. This is done to prevent strife, litigation and fraud. [*Vide* also Drey v. Doyle, 99 Mo. 458; Maupin v. Emmons, 47 Mo. 304; Vaughn v. Tracy, 25 Mo. 318, *Id.* 22 Mo. 415.]

If, under our law, possession were notice it would offer no refuge to the claim of the respondent. Her possession, as constituting notice, was rendered ineffectual by her deed to Cora Scott which she never repudiated until the trial in the instant case. By that deed the title of record passed to Scott, thence to the Lumber Company under the foreclosure proceeding, thence to Pickett, thence to Sex-

ton, who was A. A. Bianchi's immediate grantor. From April 28, 1913, the date of the deed from respondent to Scott until after September 9, 1915, the date of the deed to Sexton, the record contains nothing to show that the respondent had any interest in the property.

Even in other jurisdictions in which, unlike Missouri, possession is treated as actual or constructive notice, such notice is held to be ineffectual where there is proof of a retained possession after the possession has executed a conveyance such as that from the respondent to Scott. [Bloomer v. Henderson, 8 Mich. 395; Van Keuren v. Central Co., 38 N. J. L. 165; Hockman v. Thuma, 68 Kan. 519.] We therefore hold that the respondent after having conveyed the property to her sister, Cora Scott, and proclaimed the good faith of this conveyance by recording the deed, and the foreclosure of Scott and the respondent's interest by the judgment and sale of the property in the mechanic's lien suit, cannot by her thereafter remaining in the possession of the property, be held to have put Bianchi upon inquiry so as to affect his title.

But there is a further reason why the respondent's assertion of possession avails her nothing, in that her possession as a plea of

**Disclaimer of Ownership.** notice of a prior claim, was rendered of no effect by her testimony at the hearing of her plea of abatement in the attachment suit.

It is not alone by the execution of a deed that the occupant of land can neutralize the effect of notice by possession. Any disclaimer of title, by deed or otherwise, will effect such a result, for it is elementary that where one in possession of land, in any manner, disclaims ownership, his occupancy ceases to be notice of any equities he might otherwise assert.

The respondent's former testimony asserting title and possession in Oloff, coupled with the absence of any testimony in this case that Oloff himself did not also remain in possession until September 17, 1915, when he conveyed to Sexton, and her express denial of title in herself at the trial of the plea in abatement, which she never retracted until after the date of the Oloff-Sexton deed, defeats the claim that on that date she was in possession as owner, and that Sexton was thereby charged with notice thereof.

Even in the trial of the case neither she nor anyone testified or intimated that before the execution of the Oloff-Sexton deed she did otherwise than to hold out Oloff as the owner in possession and herself as merely his tenant.

These are the facts which Bianchi would have learned had he familiarized himself with the history of Sexton's title from the date when the respondent and her husband first acquired title onward to the time when record title vested in Sexton.

There is no evidence as to when Oloff's possession ceased. He was shown by respondent's previous testimony to have been in possession in January, 1915, and if we apply the rule that a fact once shown to exist is presumed to continue until the contrary appears, the deduction is authorized that Oloff remained in possession to and including September 17, 1915, when he conveyed to Sexton. If therefore Bianchi had made inquiry he would have found that it was Oloff who was in possession when he conveyed to Sexton and that there was no possession by respondent that would have been notice to Sexton of her now asserted claim.

"No man is held to be, or need to be, wiser than the law. He is presumed to know it, but not to be wiser than it." Garrett v. Wiltse, 252 Mo. 699.

When the respondent learned that Sexton had purchased the property from Oloff she drew from its hiding place in a safety-deposit box the purported deed from Oloff to her, and at once filed it for record with the evident purpose of invalidating Sexton's title by charging him with previous notice of the character of her possession. Aside from the invalidity of the deed, this conduct could not convert her previous occupancy into notice to Sexton of a prior title in her by antedating the spurious deed so as to make its execution appear to be before that of the Oloff-Sexton deed. Her possession, not being actual notice at the time the Oloff-Sexton deed was made, cannot be construed as such notice to Bianchi that Sexton's deed was inferior to her claim.

Possession alone not being sufficient to uphold a finding that a purchaser of the record title had actual notice, and evidence additional to possession being necessary to support such finding, the question therefore is whether the facts shown to have attended respondent's possession are sufficient as circumstantial evidence to so far supplement the fact of her possession as to uphold the finding of actual notice.

**Possession Supplemented by Circumstances.**

The circumstance of the execution by respondent of her deed to Scott, and her testimony in the attachment trial, have been stated. The only remaining circumstance shown in evidence bearing on the character of her possession is that after the foreclosure of the mechanic's liens by the Lumber Company, she remained in possession of at least a part of the premises. Possession, however, under such circumstances will not justify a finding that Sexton had actual notice, and that he took the title subject thereto, or if he did that Bianchi was aware of it.

Unless possession is not consistent with any reasonable conclusion except a claim of title, or, to state the converse, where possession is reasonably referable to any other theory than a claim of ownership in

the possessor, it will not support a finding that a purchaser of the record title had the actual notice required by Section 220, Revised Statutes 1919.

Among the cases where possession is held consistent with the theory that the occupant of land does not claim ownership, are those where the possession was merely a continued one, after the occupant's ownership had been terminated of record by the foreclosure of a lien on the premises. [McMurray v. McMurray, 258 Mo. 405; Beatie v. Butler, 21 Mo. 313.]

The holding over of the respondent therefore after the foreclosure of the mechanic's lien and the vesting of the title in the purchaser thereunder, does not warrant a finding that Sexton had actual notice of any claim to the property by the respondent, nor that Bianchi had notice that Sexton, the grantor, was charged with notice.

VI. Ringolsky, a lawyer of Kansas City, brought the first suit to enforce the payment of the due bill made by the respondent to the Monument Company. He also aided the company in securing the loan by which its agent, Sexton, was enabled to purchase the property from Oloff. Passing by the invidious and uncalled for comment on Ringolsky's conduct by the respondent in this transaction, none of which is justified by the facts, we are confronted with the contention that he was possessed with full knowledge of the priority of the respondent's claim and that Bianchi is chargeable with the same. Ringolsky was not a party to the record title. Bianchi, until after he had bought the property from Sexton, had never heard of nor had he met Ringolsky; nor had he ever heard of the property until the day he bought it from the Monument Company. There is no evidence, therefore, to put him on inquiry as to what Ringolsky knew or did.

**Inquiry.**

Without conceding that there was evidence to put Bianchi upon inquiry concerning Ringolsky's knowledge, what would Bianchi have learned if he had made such an inquiry? Absolutely nothing reflecting upon Ringolsky, nor impairing the Sexton title. Ringolsky testified that he had no konwledge or notice that Oloff had attempted to convey the title to the respondent until after the record title had gone to Sexton and she had finally filed her deed.

As to Ringolsky's lack of knowledge or notice of the Oloff-Kinsinger deed, the respondent's own testimony in the trial of this case agrees with Ringolsky's. She does not pretend that she notified him of the Oloff deed to her and that she did not notify him is manifest. She in effect admits that it was to avoid the Aylward debt that she had the Pickett deed made to Oloff in the first place. Her motives and furtive policy never changed from that hour until after the Sexton title became vested. The conclusion therefore is reasonable that

Ringolsky had no notice of the unrecorded deed and hence that under the Recording Act it was void as against him and those whom he represented, and Bianchi, had he been put upon inquiry as to Ringolsky, would have reached the same conclusion.

VII. It is the contention of the respondent that she paid the consideration for the Oloff-Pickett deed and that it was at her instance that Pickett conveyed the property to Oloff. If this be true her act was characterized by a fraudulent intent to defeat the collection of appellants' judgment and it renders Oloff's

**Fraudulent Conveyance.** deed to Sexton valid and estops her from questioning it. When one causes property to be conveyed to a fraudulent grantee the latter will take absolute title as against his grantor which he can retain or convey at will. It is not material therefore that Ringolsky may have believed that Oloff was the respondent's fraudulent trustee; because if Ringolsky had actual knowledge of that fact, his knowledge would not enable the respondent to avoid a conveyance by Oloff to Ringolsky or to Sexton. Further than this, if Oloff was a fraudulent trustee to whom the property had been conveyed with the intent on the part of the respondent to defraud Ringolsky's clients, then Oloff became invested with title and the respondent could not compel him to reconvey to her. His title as against her, was valid and she was powerless to reclaim it against his will, or prevent him from conveying to any grantee he might choose, even if such grantee had full knowledge of the facts; nor would the respondent have the right to devest the title of such grantee. Summarizing this rule the Supreme Court, in Rowley v. Rowley, 197 S. W. 152, says, in effect, that where one to defraud creditors transfers property to another neither the grantor nor his heirs will be allowed to recover it.

In the case of Charles v. White, 214 Mo. l. c. 202, 21 L. R. A. (N. S.) l. c. 481, it was said: "No rule of law is more firmly established than that the transfer of property in fraud of creditors, while void as to them, is binding on the parties and those in privity with them. The statutes against fraudulent conveyances are designed to protect the interest of creditors and were not intended in any manner to affect the rights of the parties themselves to the conveyances. This has been the uniform rule of decision in this State from our earliest reports to the present. [Van Winkle v. McKee, 7 Mo. 435; Doggett v. Ins. Co., 19 Mo. 201; Whitaker v. Whitaker, 157 Mo. l. c. 353, 58 S. W. 5; 14 Am. & Eng. Ency. Law (2 Ed.) 273, 276, note 3, and cases cited; 20 Cyc. 419, 608.]"

The deed from Oloff to the respondent having been, as she testified, carefully concealed from Ringolsky's knowledge, was rendered void as against his client, Sexton, by the Recording Act, and the Oloff-

Sexton deed as well as that from Sexton to Bianchi was valid according to her own testimony.

VIII.   As affecting the title of Mary Bianchi under the purchase of the note for $1,150 secured by the second deed of trust on the property, if A. A. Bianchi received any notice or acquired any knowledge of the Oloff-Sexton title it was not while acting as agent for his mother, Mary Bianchi, but before she knew or did anything in regard to it.   Mary Bianchi had no knowledge or connection with the transaction until the winter of 1917-1918, when, at the instance of her son and to protect the title he had acquired, she bought the $1,150 note.   From the beginning to the end of her connection with the matters involved, both she and her son were in Barre, Vermont.   If he had any notice of an infirmity in Sexton's title it must have been acquired before that time.   It is not claimed that she had any knowledge of the respondent's claims unless knowledge or notice of same be imputed to her through her son.   As he did not have any notice or knowledge while acting for her, such in imputation is not possible and in holding otherwise the trial court was in error.   The rule of law in support of the foregoing is aptly expressed in 31 Cyc., title "Principle and Agent," page 1587, paragraph "g," and notes in the following language:

**Title of Transferee of Note.**

"A principal is not affected with knowledge which the agent acquires while not acting in the course of his employment, or which relates to matters not within the scope of his authority, unless the agent actually communicates his information to the principal.   Furthermore, the relation of principal and agent must exist in order to charge one person with another's knowledge, and the knowledge of a person who is not in fact the agent of another cannot be imputed to the latter."

The $1,150 note was originally made payable to Mary Collier, who was acting for Ringolsky.   Its sale and transfer to I. B. Winnig was by an unrestricted endorsement by the payee, Collier, and Ringolsky, who also endorsed thereon an express guaranty of payment.   As thus endorsed the note was sold and delivered to Winnig for $1,025 in money paid by Winnig to Ringolsky.   This transaction occurred in November, 1915, or about one month and three weeks after the execution of the note, which was on the 17th day of September, 1915, long before its maturity, which was on the 17th day of September, 1916.   Winnig purchased the note without notice of defenses, if any, as between the original parties thereto, or of any infirmity in the title to the property covered by the deed of trust securing the note. He thus became, and continued to be so long as he retained the ownership of the note, a transferee for value (Sec. 817, R. S. 1919), and

in due course (Sec. 838), free from defenses, if any, available to prior parties among themselves and entitled to enforce payment' for the full amount of the note against all parties liable thereon (Sec. 843). Winnig remained the holder and owner of the note until February 8, 1918, when Mary Bianchi, through Carmean, her attorney, in Kansas City, purchased the note from him. She has ever since been the holder and owner thereof and as such succeeded to all of the rights of Winnig, even if she acquired it after maturity. [See the sections of the Negotiable Instrument Law above cited; Daniel on Negotiable Instruments (5 Ed.) sec. 803, p. 801; 7 Cyc. p. 938.]

The Sexton deed of trust given to secure the payment of the note was only an incident of the note itself, and all rights thereunder passed to Mary Bianchi with the transfer of the note to her. [Bank v. Frame, 112 Mo. l. c. 514; Mayes v. Robinson, 93 Mo. 114; Hagerman v. Sutton, 91 Mo. 519; Mitchell v. Ladew, 36 Mo. l. c. 533; 19 R. C. L., title "Mortgages," sec. 120, p. 347.]

IX. The parties were not *in pari delicto* as held by the trial court. The appellants had committed no forgery and there is no claim to that effect. The respondent did not participate in the sale by Wm. Oloff of his property to Sexton, nor did Sexton participate in any of the respondent's fraudulent transactions in juggling with the title to the property. The respondent swore that it was Oloff's property and he swore it was his. The respondent could only get title through him and she confirmed her oath as to his ownership by attempting, through the spurious deed, to transfer the title to herself. A careful scrutiny of the record discloses no fact upon which to base a charge of wrong-doing against the appellants, and the trial court was in error in so ruling.

*In Pari Delicto.*

X. This case presents an unusual instance of the depravity of human nature. Persons of average honesty do not, as a rule, resort to questionable methods to avoid the payment of business obligations. Especially are obligations of the nature here involved regarded by right thinking persons as of a more sacred character than ordinary debts, and it is most unusual that artifice and fraud are invoked to escape their payment. In the language of the Rogues' Calendar, it is "a poor stick that will not pay for a tombstone." If, like the vocal statute of Memnon, this momument could give utterance to the method of its erection, it would feel impelled to exclaim: "While I simulate a tribute of affection, I am a whited sepulcher and my foundation is laid in fraud."

Viewed from many points of vantage the trial court erred in the determination of this case. Its judgment therefore is reversed and

the cause is remanded with direction to the court to quiet the title to this property in A. A. Bianchi and Mary Bianchi and to render judgment in their favor according to their respective interests, subject to the note of $3,500, secured by a deed of trust on the property. *White, P. J.,* and *Blair, J.,* concur in the result.